IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                    CASE NO.: 1:07cr32-SPM

CRAIG W. CARLISLE and
ERNEST LEE LINTON,

       Defendants.
_____/

**ORDER DENYING MOTION TO SUPPRESS**

Defendant Carlisle filed a motion to suppress (doc. 29), which was adopted by co-defendant Linton. The Court heard testimony and argument at a hearing on January 4, 2008. For the following reasons, the motion to suppress will be denied.

**I.  BACKGROUND**

Carlisle and Linton face charges for growing marijuana in Carlisle's house. In Count One of the indictment the Government charges that Carlisle and Linton knowingly and intentionally manufactured and possessed with intent to manufacture more than 100 marijuana plants. The Government charges in Count Two of the indictment that Linton possessed a firearm as a convicted felon.

The motion to suppress challenges the validity of a protective sweep that Alachua County Sheriff's deputies conducted of Carlisle's house in response to a report from Carlisle that he had been shot by Linton. The motion also challenges a later-issued search warrant on grounds that the warrant affidavit contains material misstatements.

At approximately 9:00 a.m. on the morning of Monday, September 10, 2007, Linton shot Carlisle in the leg. Bleeding profusely and fearing that Linton would kill him, Carlisle ran from his house to a neighbor's house to call 911. Carlisle told the 911 dispatcher that his uncle, Linton, had stopped taking his medication and had shot Carlisle in the leg. Carlisle told the dispatcher that Linton left his house in a red truck.[1] Carlisle also gave the dispatcher his address. He did not specify that he was calling from his neighbor's house; nor did he give his neighbor's address. Carlisle then left the neighbor's house and waited in his driveway for emergency personnel to arrive.

Deputy Andrew Murray arrived before the ambulance in accordance with standard protocol to protect medical personnel in dangerous situations. Deputy

---

[1] Carlisle testified that Linton initially left in a white Mercury Grand Marquis. Linton returned then left again in a red Ford truck. It is unclear how well Carlisle could see Linton's movements from the neighbor's house. Carlisle testified that he could not be certain whether anyone was with Linton when he returned for the red Ford truck, but Carlisle presumed Linton was alone given the short amount of time that passed while Linton was gone in the white Mercury Grand Marquis.

CASE NO.: 1:07cr32-SPM

Murray had been told by the dispatcher that someone with a gun shot someone else.  He first went to the neighbor's house and spoke briefly with the neighbor on the street.  The neighbor directed Deputy Murray across the street to Carlisle's house.  Carlisle was standing in the driveway to his house, approximately 150 to 200 feet from his front door.  He was wearing shorts and a t-shirt, and Deputy Murray could see the entry and exit wounds on Carlisle's left leg.

Deputy Murray asked Carlisle what happened.  Carlisle told Deputy Murray that his uncle was off of his medication and shot Carlisle in the leg.  Carlisle told Deputy Murray that he called from the neighbor's house because he did not have a telephone.  Carlisle also told Deputy Murray that his uncle was no longer in the house.  Despite the information given by Carlisle, Deputy Murray called for back-up because he could not verify the truthfulness and accuracy of Carlisle's information, and he was concerned about Linton, the gun, and the possibility of other victims.  In the meantime, the ambulance arrived and prepared to transport Carlisle to the hospital.

Deputies Boothby and Sanders were near the area and responded to Deputy Murray's call.  When they arrived at Carlisle's house, Deputy Murray went to the ambulance to speak to Carlisle.  Deputy Murray asked Carlisle for permission to go inside the house to make sure Linton or other victims were not inside.  According to Deputy Murray, Carlisle gave permission for the deputies to

go into his house. He warned Deputy Murray to be careful of African killer bees and a bad dog in his house. Deputy Boothby spoke to Carlisle afterward. According to Deputy Boothby, he asked Carlisle if he was okay. Carlisle explained that he had an argument with the shooter. When Deputy Boothby asked Carlisle if anyone was inside the house, Carlisle said that no one was inside except the African killer bees and a dog. Deputy Boothby testified that he did not ask Carlisle for permission to enter the house, as he was intent on entering, regardless of consent, to look for the shooter, the gun, or victims.

Carlisle's testimony differed from the deputies' testimony. According to Carlisle, Deputy Murray never asked Carlisle for consent to search his house, but Deputy Boothby did. Carlisle testified that Deputy Boothby approached Carlisle while Carlisle was in the ambulance and asked for consent to search. Carlisle refused. Carlisle explained, however, that he warned Deputy Boothby about the African killer bees and dog inside because he presumed that the deputies would go inside anyway. Carlisle admitted during his testimony that before Deputy Murray arrived, he went into his house to switch the circuit breaker, which turned off the lights, and closed interior doors.

After Carlisle was taken away by ambulance, Deputies Murray, Boothby, and Sanders entered the house through the garage door. They had their weapons drawn and proceeded through the house. Deputy Boothby testified that he saw blood drops inside the garage. More blood and bloody footprints were

CASE NO.: 1:07cr32-SPM

found throughout the house.  Toward the back of the house, the deputies found numerous marijuana plants along with harvested plants that were set out to dry.  The marijuana was in plain view.  No shooter, guns, or victims were found.

Deputy Murray called narcotics detectives to report the marijuana.  Detective Joe Hood arrived at the scene.  He walked through the house again to view the marijuana.  While Detective Hood was there, Linton returned in the red Ford truck.  Deputies arrested Linton in the driveway.

Detective Hood prepared an affidavit to obtain a warrant to fully search Carlisle's house.  In the affidavit, Detective Hood related the circumstances of the case, including the 911 call, the protective sweep, and the discovery of the marijuana.  Based on Detective Hood's affidavit, Judge Peter K. Seig of the Eighth Judicial Circuit, Alachua County, Florida, issued a search warrant.

Carlisle contends that the search warrant is invalid under Franks v. Delaware[2] because Detective Hood made material misstatements in the affidavit.  Specifically, Carlisle complains that (1) Hood stated that Carlisle called from Carlisle's house to report the shooting, but in actuality Carlisle called from a neighbor's house; (2) Hood stated that Carlisle gave consent for the deputies to enter his house to look for Linton, but Carlisle denies giving consent; (3) Hood stated that the protective sweep was conducted to ensure that Linton or victims

---

[2] Franks v. Delaware, 438 U.S. 154 (1978).

were not inside, but Carlisle claims that the reason is false because he told the deputies that Linton had fled and that nobody was inside; and (4) Hood stated that Carlisle has a "criminal history" but he failed to qualify that Carlisle has no convictions.

## II.   DISCUSSION

### A.   Consent

As a general rule, a search warrant is required before the Government can search a person's house.  There are certain exceptions, however.  Consent to search is one of them.  A valid search of a house may be made without a search warrant and without probable cause if the person in control thereof has given consent.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When consent to search is given without specific limitations, the extent of the search is limited to what law enforcement can reasonably interpret the consent to include given the object of the search.  United States v. Street, 472 F.3d 1298, 1308 (11th Cir. 2006).

In this case, the Court credits as true Deputy Murray's testimony that he asked Carlisle for consent to go inside Carlisle's house to look for Linton and Deputy Murray's testimony that Carlisle gave consent.  The consent was valid despite the fact that Carlisle had been shot.  Carlisle was not under arrest.  The deputies did not engage in coercive behavior.  Carlisle cooperated with the deputies by letting them know of possible dangers in the house.  Carlisle

CASE NO.: 1:07cr32-SPM

understood the questions asked of him and responded appropriately. He may have believed that no incriminating evidence would be found during a quick sweep to check for Linton since Carlilse turned off the lights and closed the interior doors before Deputy Murray arrived. These are all factors that indicate Carlisle's consent was valid.[3]

Based on Carlisle's consent, the deputies acted appropriately in conducting a sweep of Carlisle's house to look for Linton. The scope of the protective sweep was consistent with the purpose of the search and the consent given by Carlisle. Accordingly, the Court finds no basis for suppressing the marijuana that the deputies saw in plain view while conducting the protective sweep.

### B. Exigent Circumstances

In addition to Carlisle's consent, the protective sweep was lawful based on exigent circumstances. In United States v. Holloway, the Eleventh Circuit Court of Appeals held that exigent circumstances justified a warrantless search of a house based on a 911 report of gunshots and arguing coming from the house.

---

[3] Some factors to consider to determine whether consent to search is voluntary are whether the defendant was free to leave, the existence of coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse consent, the ability of the defendant to refuse consent, the extent of the defendant's education and intelligence, and whether the defendant believed that no incriminating evidence would be found. United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002).

CASE NO.: 1:07cr32-SPM

United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002).  When officers arrived on the scene, they secured a husband and wife who were on the porch and a neighbor who came from behind a horse trailer parked in the yard.  Id. at 1332-33.  An officer found shotgun shells on the porch.  Id. at 1333.  During a search of the residence to look for possible victims, an officer found a shotgun in plain view.  Id. at 1333, 1340.  The Eleventh Circuit found that the possibility of victim inside justified an immediate search.  Id. at 1338.

The Eleventh Circuit explained that "when exigent circumstances demand an immediate response, particularly where there is danger to human life, protection of the public becomes paramount and can justify a limited, warrantless intrusion into the home."  Id. at 1334.  The goal is not to find evidence of a crime, but to rescue any victims and ensure the safety of the public and officers.  Id. at 1338.  Thus, when law enforcement officers are faced with an emergency situation and reasonably believe that a person may be in danger, they may enter a house to conduct a limited search.  Id. at 1339; see also United States v. Valencia, 499 F.3d 813, 816 (8th Cir. 2007) (protective sweep of apartment to search for shooter, weapon, and victims was reasonable in light of report of gun shots from apartment). The holding is consistent with the long-standing principle that probable cause is a flexible standard, taking into account the degree of intrusion and the public interest at stake in assessing the reasonableness of a search under the Fourth Amendment.  See Michigan v. Tyler, 436 U.S. 499, 506

(1978) (probable cause standard "var[ies] with the object and intrusiveness of the search").

As in <u>Holloway</u>, the deputies in this case were faced with an emergency situation and had probable cause to believe that a person may be in danger. They were responding to a 911 call involving an actual shooting. On the scene, Deputy Murray confirmed that a shooting had in fact occurred by observing the entry and exist wounds on Carlisle's leg. Deputy Murray could not verify, however, the information given by Carlisle concerning Linton and the absence of victims inside the house. To the contrary, the improbable statement Carlisle made about African killer bees could only raise suspicions that Carlisle's statements were not truthful or accurate. Faced with an actual shooting and the possibility that the shooter or victims could be in the house, the deputies acted reasonably in conducting a protective sweep through Carlisle's house. The Court finds no basis for suppressing the marijuana that the deputies saw in plain view while conducting protective sweep.

### C.    Franks Challenge

To prevail on his <u>Franks</u> challenge, Carlisle must show two things: first that Detective Hood intentionally or recklessly made misstatements or omissions in the search warrant affidavit; and second that the misstatements or omissions were material to a proper determination of probable cause. <u>United States v. Burston</u>, 159 F.3d 1328, 1333 (11th Cir. 1998). Carlisle cannot make these

showings.

First, most of the misstatements that Carlisle identifies in the search warrant affidavit are not misstatements at all. The statement that Carlisle gave consent for the deputies to enter his house, the Court has found, is true. The statement that the deputies conducted a protective sweep to look for the shooter or victims is true. The statement that Carlisle has a criminal history, albeit no convictions, is also true. The one statement that is not true in the affidavit is that the 911 call came from Carlisle's house, when in fact the call came from the neighbor's house. Although the statement is not true, there is no indication that Deputy Hood made this misstatement intentionally or recklessly.

Assuming, however, that Deputy Hood should have known where the 911 call came from, Carlisle cannot show that the misstatement was material to a finding of probable cause. The basis for finding probable cause to issue the search warrant was the fact that marijuana plants were observed in plain view while the officers conducted a lawful protective sweep of Carlisle's house. The fact that Carlisle made the 911 call from the neighbor's house as opposed to his own house does nothing to undercut the basis for finding probable cause; nor do any of the other misstatements claimed by Carlisle. Accordingly, Carlisle's motion to suppress based on his <u>Franks</u> challenge will be denied.

## III.    CONCLUSION

CASE NO.: 1:07cr32-SPM

The protective sweep that deputies conducted of Carlisle's house was lawful based on Carlisle's consent and lawful based on exigent circumstances. In the search warrant affidavit, Deputy Hood did not make any intentional or reckless misstatements that were material to a finding of probable cause. Thus there is no basis under Franks v. Delaware to suppress the evidence found during the search. Based on the foregoing, it is

ORDERED AND ADJUDGED that the motion to suppress (doc. 29) filed by Carlisle and adopted by Linton is denied.

DONE AND ORDERED this 11th day of January, 2008.

*s/ Stephan P. Mickle*
Stephan P. Mickle
United States District Judge